Filed 4/7/25  P. v. Harper CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALYAIS HARPER,<br><br>    Defendant and Appellant. | D083316<br><br><br>(Super. Ct. No. BAF1801308) |

APPEAL from a judgment of the Superior Court of Riverside County, Matthew C. Perantoni, Judge.  Reversed and remanded with directions.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

In October 2018, Alyais Harper made the devastating decision to shoot and kill Trejean Cullors, and then fire several more rounds at Cullors's three friends as they ran for their lives. Harper was 20 years old at the time of the shooting. Cullors had just turned 22. For his actions, Harper was convicted of special circumstance murder and three counts of attempted premediated murder, and effectively sentenced to multiple lifetimes in prison.

A crucial issue in this case, at trial and on appeal, is whether the offenses were gang related. The prosecution theorized that Harper belonged to a nascent gang called ATM/ESF,[1] and the shooting was an act of retaliation based on one or more earlier disputes involving Cullors. The defense, on the other hand, insisted that the shooting was a family matter— Cullors's father had allegedly killed Harper's aunt years prior. The son of this aunt and Harper's cousin, Jovan M., was with him during the shooting.

A jury ultimately found true that the murder of Cullors was carried out to further the activities ATM/ESF (Pen. Code, § 190.2, subd. (a)(22))[2] and that all four offenses were committed for the benefit of, at the direction of, or in association with ATM/ESF, with the specific intent to promote, further, or assist in criminal conduct by its members (§ 186.22, subd. (b)(5).) Harper raises several challenges to the sufficiency of the evidence to support the jury's true findings on these allegations. For reasons we explain, we agree with him that the prosecution failed to establish that ATM/ESF was a "criminal street gang" under the law as recently amended by Assembly Bill No. 333 (Stats. 2021, ch. 699, § 4, eff. Jan. 1, 2022) (Assembly Bill 333).

---

[1]     See section B.1., *post*.

[2]     All further undesignated statutory references are to the Penal Code.

Since the gang allegations all depend on proof of the existence of a criminal street gang, we must reverse all of the true findings on those allegations.

Separately, Harper contends there is insufficient evidence that he intended to kill Cullors's fleeing friends. He asserts the evidence conclusively shows that he was shooting his gun at the ground. We disagree and affirm his attempted murder convictions. Lastly, Harper identifies an error in the abstract of judgment. Given our reversal of the gang allegations, this issue has become moot. Harper will be resentenced and a new abstract will issue.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Shooting*

On the evening of October 14, 2018, Cullors was hanging out at home with family and friends, including his cousins Omari M. and DiMarques W., his younger brother, and two of his younger brother's friends, Joseph M. and Reagan W. They were all in their late teens or early twenties at the time.

Close to midnight, Cullors, Omari, DiMarques, and Joseph left the house in Cullors's car. Omari thought they were going to the gas station to get snacks. On the way, however, after Cullors received a message on his cell phone, he told the others they were going to "meet up with some people" instead, and drove to a McDonald's in Beaumont. DiMarques understood that Cullors had somehow gotten word that Harper "wanted to fight [Cullors] or somebody that was at the house" with them. Joseph similarly understood that they were going to see if some "kids" wanted to fight Cullors.

When they arrived, they all got out of the car and saw Harper and Jovan M. outside the McDonald's. Most of the six young men were familiar with each other, having grown up in the same community. They came together in the parking lot and began a conversation.

3

The discussion started off cordially, although DiMarques noticed that Harper had his hands in his pockets and Jovan seemed nervous. At some point, Harper asked about Reagan W. (Cullors's younger brother's friend who was at the house). Cullors responded something to the effect of, "[H]e's not here, but I'm here. So you can talk to me." Omari and DiMarques understood the exchange to mean that Harper wanted to fight Reagan or had a problem with him specifically.

Jovan then said "something to do with family" that provoked Cullors. The two started arguing. Jovan—who was five-foot-something and about 170 pounds—pushed Cullors—who was six-foot-one, nearly 240 pounds, and muscular. Cullors tried to swing at Jovan but missed, then Jovan took off running. Cullors chased after him, attempting to catch him and punch him. As they ran around in circles, Jovan yelled that he did not want to fight anymore. Meanwhile, the other four young men watched and commented on the spectacle. Per Omari, no one tried to intervene. But DiMarques recalled that Harper told Cullors to stop. Cullors and Jovan eventually tired and rejoined the group. The six of them formed a circle and continued talking casually.

A minute or two later, Clarence C. exited a car that had been parked in the McDonald's parking lot. He walked directly to Harper and gave him "a look" or whispered something in his ear. A few seconds after that—maybe 5 or 10 seconds—Harper pulled out a gun and shot Cullors in his face from across the circle, about 10 feet away. Cullors fell to the ground and Harper shot him twice more in his shoulder and arm.

Omari, DiMarques, and Joseph took off running. Harper fired three or four additional shots at them as they fled. The trio ran through a shopping center, crossed the street, hopped a fence, and hid in someone's backyard.

4

After about 40 minutes, they went to a nearby donut shop and called a family member for help.

Passersby heard the gunshots and called 911. Police responded to the scene around 1:00 in the morning on October 15. Cullors did not have a pulse, and an officer began performing CPR. Paramedics arrived and took him to the hospital, where he ultimately died as a result of the initial gunshot wound to his head and neck.

## B. *The Prosecution*

The Riverside County District Attorney charged Harper with one count of murder (§ 187, subd. (a)) and three counts of attempted premeditated murder (§§ 664, 187, subd. (a)). As to the murder charge, the prosecution alleged a firearm enhancement (§ 12022.53, subd. (d)), a gang alternate penalty (§ 186.22, subd. (b)(5)), and a gang special circumstance (§ 190.2, subd. (a)(22)). Regarding each attempted premeditated murder count, the prosecution alleged a firearm enhancement (§ 12022.53, subd. (c)) and a gang alternate penalty (§ 186.22, subd. (b)(5)).

The prosecution theorized that Harper was a member of a gang called ATM/ESF, and that the shooting was an act of retaliation against Cullors based on his connection to one or more earlier events. We will first discuss the prosecution's evidence describing ATM/ESF, and then each prior event that may have given rise to the shooting in reverse chronological order.

### 1. *ATM/ESF*

The prosecution presented the testimony of Beaumont Police Officers Randall Casey and Christopher Crews, as well as Banning Police Officer Daniel Deusenberry, all of whom served on a gang task force that covered the Banning/Beaumont region around the time of the shooting.

5

The gang task force worked on gang awareness, intervention, and suppression. This involved collecting information from gang members, the public, and local schools, as well as monitoring graffiti and vandalism, to determine if gangs were developing in the area and intervene when needed. If a crime occurred that seemed gang-related, someone from the task force would participate in the investigation "to offer knowledge and information that they may know about the gang that could" help solve the crime. Officers Casey and Crews participated in the investigation of this case.

The officers explained that ATM stands for "Addicted to Money" and "ESF" means "East Side Family." The group sometimes calls itself "Money Gang" as well. Their symbols include dollar signs and money bags. Sixth Street and the number 6 are also significant to them because "some of the guys that originated the gang" had family that lived on that street. The officers identified these phrases, acronyms, and symbols in graffiti around Banning and Beaumont; in drawings found in the home of brothers Edwin and Isaiah M. in April 2018; and in tattoos on Clarence C. and Edwin M.

Casey described ATM/ESF as "a group that started evolving" that they "were keeping an eye on." Deusenberry similarly characterized ATM/ESF as "very new." Law enforcement first became aware of the group in late 2016, when some members robbed a person at gunpoint in a local park. Crews testified that by mid-2019 ATM/ESF became inactive or "went off the radar."

The officers believed that ATM "started off as a group of friends"— including brothers Edwin and Isaiah M., as well as Tajah S. At some point— perhaps around 2017—ATM/ESF divided into two "branches," although both branches continued to use ATM/ESF symbols. One branch remained committed to "a street gang lifestyle" whereas the other focused on rap music. Harper "was big into the music branch." At least as to the "street gang

6

lifestyle" branch, Crews opined that ATM/ESF's primary activities were robberies and assaults. He thought that its members committed two or three robberies/assaults.

By late 2018, Deusenberry estimated that ATM had about 15 to 20 members, although he had personally contacted only about 10 of them. Crews gave a more conservative estimate, opining there were "maybe seven to ten" members. As far as the officers knew, the group did not have an established hierarchy or "shot callers."

Based on social media, "communications with witnesses and gang members," and "reviews of interviews," Crews opined that Harper was a member of ATM/ESF. Harper had "ESF" and "East Side Family" on his publicly accessible social media profile. In two social media photos, Harper is displaying the ATM hand sign. Crews explained that a person would not publicly claim a particular gang if they were not truly a member because the gang could exact consequences on that person ranging from assault to murder. Deusenberry and Crews also identified Harper in photos with Isaiah M., Clarence C., and Tajah S.

## 2. *The Liquor Store Altercation*

The night of the shooting, Zerrion O. worked the late shift at McDonald's. Before his shift, he went to the liquor store across the street to grab a snack. When he exited the store, he encountered Reagan W. Reagan called Zerrion a racial slur and "hit [him] up" to see whether he belonged to a gang. Zerrion said he was not involved with that, then Reagan shoved him. Zerrion pushed him back, then the store owner came outside and broke it up.

Before this altercation, Zerrion had no issues with Reagan. Zerrion believed Reagan was friends with Cullors, but he did not know whether either of them were gang affiliated. In an interview with Officer Crews after

7

the fact, the liquor store owner said there were "people hanging out of a window" yelling, " 'East Side/West Side ATM' " when Zerrion and Reagan got into the altercation.

After the fight, Zerrion headed into work. Around midnight, Harper and Clarence C. arrived at the McDonald's. Zerrion knew them from high school, and he told them "a little bit about the altercation." At trial, Zerrion recalled that he "maybe" told them that Reagan was involved in the fight. He did not ask Harper and Clarence to do anything about it, and they did not seem angered by what he was telling them. Zerrion did not know whether Harper and Clarence were involved with any gang.

Later that night, Zerrion heard gunshots outside McDonald's. He ran outside and saw someone lying on the ground and another guy "panicking" in the street. The latter individual urged Zerrion to call 911. Zerrion ran back inside to tell his manager.

3.    *Snapchat Video*

A few days after the shooting, Officer Crews became aware of a Snapchat video of Cullors saying: "Fuck ESF. Fuck ATM. N[***]as got an issue n[***]a. I'm pressing the line. That's just what it is." It was not clear when the video was recorded. Crews opined that the video would be considered disrespectful and challenging to ATM/ESF, and would prompt retaliation from the gang.

4.    *Eastside Park Incident*

About one week before the shooting, Harper and Cullors arranged to meet at Eastside Park with their respective "groups." The plan was that Harper would fight Reagan W. and Cullors would fight Harper's cousin, but the cousin did not show up. Harper and Reagan started "boxing" anyway, but before anyone landed a punch, Cullors fired several gunshots into the air and

8

announced, "[T]his shit is over." Harper and his friends quickly got into their car and left. No one was injured.

Harper and Cullors talked about the park incident later on. Cullors said he only fired his gun to protect "his little brother." Harper said, "[C]ool," and clarified that he only had an issue with Reagan W.

5. *Cullors's Father Allegedly Killed Jovan M.'s Mother*

Police arrested Harper two days after the shooting. In interviews with detectives, Harper acknowledged that he was friends with Clarence C., that Jovan M. was his cousin, and that he knew Zerrion, Cullors, and Reagan W. from high school. He admitted to having issues with Reagan. He otherwise denied having anything to do with the shooting.

Harper was then placed in a jail cell with undercover officers dressed as inmates. When they asked Harper what happened, he said there was "a long-lasting history" and "over lasting anger" of "family do our family foul," indicating that Jovan's mother (Harper's aunt) was killed by Cullors's father.

He went on to explain that when the six met up at McDonald's, Cullors seemed to recognize Jovan. Jovan introduced himself as "so and so's son," which prompted Cullors to "sucker punch[ ]" Jovan in the face and chase him. Harper saw "so much fucking fear in [Jovan's] face" and decided he was "done" and Cullors "fucked up." He admitted that when Cullors rejoined the group, he shot Cullors multiple times.

Harper expressed frustration that Cullors's father was not held accountable. "Growin' up," he explained, "that's all me and my cousin would talk about, 'Why the fuck ain't our big brothers put this n[***]a down.'" He indicated that his uncles were in unspecified gangs.

9

## C. *The Judgment*

A jury found Harper guilty of one count of first degree murder and three counts of attempted premeditated murder. The jury found true all firearm allegations and gang allegations.

The trial court imposed life in prison without the possibility of parole (LWOP) for the special circumstance murder (§ 190.2, subd. (a)(22)), consecutive to 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). For each of the three attempted premeditated murder counts, the court imposed 15 years to life pursuant to the alternate gang penalty (§ 186.22, subd. (b)(5)), consecutive to 20 years for the firearm enhancement (§ 12022.53, subd. (c)). Accordingly, the total aggregate sentence was LWOP consecutive to 130 years to life.

## DISCUSSION

### A. *The evidence was insufficient to prove ATM/ESF was a "criminal street gang" within the meaning of amended section 186.22.*

Harper raises multiple challenges to the sufficiency of the evidence supporting the jury's true findings on the gang allegations. Relevant to the special circumstance and the alternate penalties, he contends the evidence failed to prove ATM/ESF constitutes a "criminal street gang" under the law as amended by Assembly Bill 333 (Stats. 2021, ch. 699, § 4).

Regarding the special circumstance only, he further claims there is insufficient evidence that he knew ATM/ESF members engaged in a pattern of criminal gang activity, or that the murder was carried out to further the activities of ATM/ESF. As to the alternate penalties, he argues there is no substantial evidence that the offenses were committed for the benefit of, at the direction of, or in association with ATM/ESF, with the specific intent to

10

promote, further, or assist criminal conduct by ATM/ESF members. He maintains the shooting was not gang related.

We agree with Harper on his first contention, and therefore do not reach his remaining challenges to the gang allegations. To establish a "criminal street gang" under the new law, the prosecution must prove that its members have collectively engaged in "a pattern of criminal gang activity," which in turn requires proof of at least two predicate offenses satisfying several new criteria. For reasons we will explain, we agree with Harper that the prosecution failed to prove two qualifying predicate offenses.

1.    *Standard of Review*

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*), citations omitted.)

2.    *Section 186.22 as Amended by Assembly Bill 333*

"The Legislature first enacted section 186.22 in 1988 as part of the California Street Terrorism Enforcement and Prevention Act, also known as the STEP Act." (*People v. Clark* (2024) 15 Cal.5th 743, 751 (*Clark*), citations omitted.) Section 186.22, subdivision (a) defines a substantive offense

11

punishing active participation in a criminal street gang.  Subdivision (b) prescribes increased punishment—sentence enhancements or alternate penalties depending on the underlying offense—when a felony offense is committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members.  (See *Clark*, at pp. 751–752.)

Some 33 years later, the Legislature took the opportunity to review and revisit the state's experience with the STEP Act as part of its consideration of new legislation, and it made a number of specific findings.  According to the Legislature, "The STEP Act was originally enacted to target crimes committed by violent, organized criminal street gangs.  Proponents claimed the prosecution would be unable to prove an offense was committed for the benefit of, or in association with, a gang 'except in the most egregious cases where a pattern of criminal gang activity was clearly shown.' "  (Stats. 2021, ch. 699, § 2, subd. (g), citations omitted.)  In the decades following its enactment, however, the STEP Act was "continuously expanded through legislative amendments and court rulings" until gang enhancements became ubiquitous, disproportionately impacting communities and people of color.  (Stats. 2021, ch. 699, § 2, subds. (d)(1)–(4), (7)–(10), (g)).  The social networks in neighborhoods targeted for gang suppression have often been "mischaracterized as gangs despite their lack of basic organizational requirements" (*id*., subd. (d)(8)), and people have frequently been "lumped into a gang social network simply because of their family members or their neighborhood" (*id*., subd. (d)(9)).  In its broadened form, section 186.22 effectively criminalized entire neighborhoods and punished people based on cultural identity, who they knew, and where they lived.  (Stats. 2021, ch. 699,

12

§ 2, subd. (a).) At the same time, no empirical evidence has shown that gang enhancements meaningfully reduce crime or violence. (*Id.*, subds. (c), (g).)

In response to these findings, among others, the Legislature passed Assembly Bill 333, also known as the STEP Forward Act of 2021. (Stats. 2021, ch. 699, §§ 1–2.) Effective January 1, 2022, this legislation substantially amended section 186.22 to raise the standards for proving gang allegations, thereby restricting the application of gang-based punishment and recalibrating the statute to its original intent. (See *People v. Cooper* (2023) 14 Cal.5th 735, 744–745; *Clark*, *supra*, 15 Cal.5th at p. 761.)[3] In relevant part, Assembly Bill 333 narrowed the definitions of "criminal street gang" and "pattern of criminal gang activity." (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

As currently defined, a "criminal street gang" is an "ongoing, organized association or group of three or more persons" that: (1) has a common name or common identifying sign or symbol; (2) has, as one of its primary activities, the commission of the offenses listed in section 186.22, subdivision (e)(1); and (3) whose members collectively engage in or have engaged in *a pattern of criminal gang activity.* (§ 186.22, subd. (f).)

To establish a pattern of criminal gang activity, the prosecution must prove "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of," at least two

---

3 Assembly Bill 333 also added section 1109, which allows the defense to seek bifurcation of gang allegations. (Stats. 2021, ch. 699, § 5.)

13

offenses from a list set forth in section 186.22, subdivision (e)(1).[4]  These are referred to as predicate offenses.  (See *Clark*, *supra*, 15 Cal.5th at p. 752.)

With respect to the predicate offenses, the law now requires the prosecution to satisfy the following requirements:  (1) the charged offense cannot be used as a predicate offense; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to just persons; (4) the predicate offenses must have *commonly benefited* a criminal street gang; and (5) the common benefit must be *more than reputational*.  (§ 186.22, subd. (e)(1)–(2); see also *Tran*, *supra*, 13 Cal.5th at p. 1206.)  Examples of nonreputational benefits "include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

"Although Assembly Bill 333 does not expressly address the gang-murder special circumstance set forth in section 190.2, subdivision (a)(22), the latter statute defines 'criminal street gang' by express cross-reference to section 186.22, subdivision (f)."  (*People v. Hin* (2025) 17 Cal.5th 401, 461 (*Hin*).)  Accordingly, Assembly Bill 333 indirectly amended the gang special circumstance as well.  (See *People v. Rojas* (2023) 15 Cal.5th 561, 565.)

3.    *The Alleged Predicate Offenses of ATM/ESF*

In this case, the prosecution presented evidence of two predicate offenses.  In the first offense, Tajah S., Edwin M., and two unidentified cohorts attacked a man named Fabian P.  As Fabian recounted at trial in

---

[4]    The list includes assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) and robbery (§ 211).  (§ 186.22, subd. (e)(1)(A)–(B).)

this case, he attended a party in Banning the night of November 19, 2017. He was sitting by a firepit when four men approached him. They "[s]eemed like very nice guys" and "chitchatted" with Fabian. They mentioned "they were part of a group" called ATM or Money Gang. Fabian had never heard of it before. One of the men was wearing "a really cool jacket." He bragged that "he had taken it off of a kid walking down the street."

After the party, Fabian was walking to his car alone when he was suddenly punched on the side of his face. He turned and saw the same four men. He was hit in the face again and thrown to the ground, then three of the men kicked him while the fourth held a shotgun to his head. They took his shirt, his $100 shoes, some cash, a vape, an Adidas watch, and a faux-diamond chain. During the attack, they said, "[G]ive me your stuff" and used "other foul language." His face was rendered "unrecognizable" from the bruising and swelling.

Fabian reported the attack to the police the next day. Based on his description, it was believed that the suspects involved in the case were gang members. Deusenberry—one of the officers who served on the Banning/Beaumont gang task force—investigated the case. He presented Fabian with a photographic lineup. Fabian was able to identify two of his assailants—Tajah S., who held the shotgun, and Edwin M., who punched him and pushed him to the ground. Deusenberry "was very familiar with" Tajah and Edwin based on "multiple prior contacts throughout the city related to various calls for disturbances and other crimes such as robbery." He believed they were ATM/ESF members.

Deusenberry contacted Tajah and Edwin. He saw a necklace "consistent with" the one taken from Fabian on Edwin, but it was not confiscated from him. None of Fabian's property was ever recovered. The

15

parties stipulated that Tajah pleaded guilty to robbery (§ 211) and personal use of a firearm (§ 12022.53, subd. (b)) in December 2018 based on his participation in the attack.[5]

Evidence of the second predicate offense was limited to the following stipulation between the parties: "Jovan M. . . . pled guilty and was convicted of a felony violation of Penal Code section 182/PC 245(a)(4), conspiracy to commit an assault with force likely to cause great bodily injury. The date of the offense was 10/15/18. The named victim was Trejean Cullors. The date of conviction was 8/1/22."[6]

---

[5] Before the parties entered their stipulation on the record, Crews had testified that Tajah pleaded guilty to "robbery with a firearm for the benefit of a criminal street gang" and, in the course of that plea, admitted that "ATM is a gang." Because Tajah's purported admissions predated Assembly Bill 333, we do not consider them as evidence that the offense commonly benefited the gang in a more than reputational manner within the meaning of the amended law. (See, e.g., *People v. Lamb* (2024) 16 Cal.5th 400, 445 (*Lamb*).)

[6] At the beginning of trial, defense counsel argued that this could not constitute a predicate offense under amended section 186.22—specifically, newly added subdivision (e)(2) that forbids "[t]he currently charged offense" from being "used to establish the pattern of criminal gang activity"—because it was part of the same event giving rise to the current charges. Relying on the plain language of the new subdivision, the prosecutor argued that Jovan's conspiracy offense, while close in time, was distinct from the currently charged offenses; the conspiracy was complete before the shooting unfolded. He also highlighted that Harper and Jovan were charged with different crimes in separate pleadings. The trial court agreed with the prosecution that, based on the plain language of the amended statute, the conspiracy offense was admissible as a predicate offense. Harper does not press this issue on appeal.

16

4.      *Insufficient Evidence of Two Qualifying Predicate Offenses*

Harper contends the prosecution failed to prove the robbery of Fabian P. conferred a common benefit on ATM/ESF that was more than reputational, and thus the prosecution failed to establish that the offense qualified as a predicate under the new law. In a one-paragraph response, the Attorney General primarily argues that the offense benefited ATM/ESF financially. He highlights the evidence that multiple ATM/ESF members attacked Fabian together, that robberies and assaults are the primary activities of ATM/ESF, and that many of their signs and symbols involve money.

We find the Supreme Court's recent decisions in *Cooper*, *supra*, 14 Cal.5th 735, *Lamb*, *supra*, 16 Cal.5th 400, and *Hin*, *supra*, 17 Cal.5th 401, instructive on this issue. In each of these cases, Assembly Bill 333 took effect after the defendant's trial, while the case was pending on appeal. In each case, it was undisputed that the new amendments applied retroactively; the issue was whether the lack of instruction requiring the jury to find that the alleged predicate offenses commonly benefited the gang in a more than reputational manner was harmless beyond a reasonable doubt. The Supreme Court could not deem the error harmless in any of these three cases. (*Cooper*, at pp. 741–742; *Lamb*, at pp. 448, 455; *Hin*, at pp. 461–463.)

In *Cooper*, the prosecution presented records of conviction and gang expert testimony establishing two predicates: a robbery committed by one gang member and a narcotics sale by another member. (*Cooper*, *supra*, 14 Cal.5th at p. 743.) The expert also testified that the gang's primary activities included robbery and narcotics sales. (*Ibid*.) But there was no evidence of the circumstances surrounding the predicate offenses nor evidence explaining how the gang commonly benefited from them. (*Ibid*.) On that record (or lack thereof), a jury could have reasonably found that the predicate offenses were

17

committed for personal gain alone, and thus the court could not deem the instructional error harmless beyond reasonable doubt. (*Id.* at pp. 744, 746.)

The *Cooper* court rejected the Attorney General's argument "that crimes that have an inherent financial benefit and that are identified as the gang's primary activities qualify as a common benefit to the gang that is 'more than reputational' under Assembly Bill 333." (*Cooper*, *supra*, 14 Cal.5th at p. 743.) The court clarified that "the question of whether an offense is within the gang's primary activities is distinct from the question of whether a particular offense has 'commonly benefited' " the gang. (*Ibid.*) The former inquiry concerns "the types of activities in which a gang typically engages" whereas the latter asks how "the specific predicate offense *actually benefited the gang.*" (*Ibid.*, italics added.) Moreover, if the prosecution could establish a predicate by simply showing that a gang member committed an offense coinciding with a primary activity of the gang that typically involves a financial benefit—and there are many such offenses listed in section 186.22, subdivision (e)(1)—then the new requirements that each predicate also commonly benefit the gang in a more than reputational way would be "mere surplusage." (*Cooper*, at p. 744.) The court lastly noted that the Attorney General's interpretation was inconsistent with legislative history "indicating the Legislature was concerned with 'lax' interpretations of the prior law that allowed for overly expansive application of gang enhancements and therefore sought to amend the law by 'making the standards for applying a gang enhancement more rigorous.' " (*Id.* at pp. 744–745, citation omitted.)

In *Lamb*, the prosecution presented certified records of five predicates, each involving a true finding or an admission to a gang enhancement under former section 186.22. (*Lamb*, *supra*, 16 Cal.5th at pp. 444–447.) But as in *Cooper*, there was no evidence describing the circumstances of the predicate

18

offenses or explaining how any specific offense *actually* provided a common benefit that was more than reputational. (*Lamb*, at pp. 445, 451, 454.) It was not enough that the predicates—which included witness dissuasion and financial crimes—"could *in theory* have offered a common benefit that was more than reputational under amended" section 186.22, subdivision (g). (*Lamb*, at p. 453, italics added.) There needed to be evidence establishing the actual, common, extra-reputational benefit to foreclose the possibility that the jury found the benefit was merely reputational. (*Id*. at pp. 453–455.)

Similarly, in *Hin*, the prosecution presented evidence of three predicate offenses: sale of a controlled substance, burglary, and murder. (*Hin*, *supra*, 17 Cal.5th at p. 462.) The prosecutor's gang expert "testified that the types of crimes alleged as predicate offenses . . . could have offered both reputational and non-reputational benefits to a gang. For example, she testified that gang members may generate revenue for the gang by engaging in 'drug sales,' 'stealing cars,' and 'burglaries.'" (*Id*. at p. 463.) The expert did not testify, however, "as to whether the specific alleged predicate offenses of [the] drug sale or [the] burglary benefited [the gang] as a whole, and the record [was] otherwise silent as to the circumstances of those two predicate offenses." (*Ibid*.) Since the evidence did "not show that either crime was committed for the benefit of the gang rather than for personal gain . . . , a rational juror could have concluded that [those] two predicate offenses 'were committed for personal gain alone.'" (*Ibid*.) The court therefore could not say the instructional error was harmless. (*Ibid*.)

We recognize that the harmless error analysis in *Cooper, Lamb*, and *Hin*, is distinct from the substantial evidence issue before us in this case. (See *Hin*, *supra*, 17 Cal.5th at p. 462 ["[u]nlike a sufficiency of the evidence claim, where we view the evidence in the light most favorable to the

19

prosecution and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence, 'our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the opposite conclusion' "].) But we nevertheless find those cases helpful insofar as they clarify the kind of evidence needed to satisfy the requirements that each predicate offense provide a common benefit to the gang that is more than reputational. It is not enough that the alleged predicate offense could theoretically confer such a benefit. It is also insufficient to show that the alleged offense coincides with a primary activity of the gang, or that the offense inherently involves some financial benefit. Rather, there must be some evidentiary basis for the trier of fact to find that the gang actually received the requisite benefit from the specific predicate offense alleged.

Thus, the precise question before us in this case is whether the record contains evidence from which the jury could have reasonably inferred that the robbery of Fabian P. actually conferred a common benefit on ATM/ESF that was more than reputational. We see no such evidence in the record.

As described above, the evidence of the robbery included Fabian's testimony, Deusenberry's testimony, and the stipulation regarding Tajah S.'s guilty plea. Viewing this evidence in the light most favorable to the judgment, the jury could have reasonably found that four ATM/ESF members—including Tajah and Edwin M.—spent time with Fabian at a party and told him that they belonged to ATM/ESF. Later that night, the four members worked together to severely beat and rob Fabian at gunpoint, taking his shirt, his shoes, some cash, a vape, an Adidas watch, and a faux-diamond chain. Based on Deusenberry's later observation that Edwin was wearing a chain that looked like the one taken from Fabian, the jury also

20

could have rationally found that Edwin was in fact wearing Fabian's faux chain after the robbery.

Based on this evidence, the Attorney General principally argues that the jury could have reasonably found that the robbery benefited ATM/ESF financially. But there was no evidence explaining what became of Fabian's belongings other than the chain. There was no direct or circumstantial evidence to suggest that ATM/ESF—as opposed to Tajah, Edwin, and/or the other cohorts individually—used or enjoyed the benefits of the loot.

For instance, there was no evidence that the four members sold Fabian's things to purchase something for the gang. And the items taken— worn clothing and accessories, a used vape, and an unknown amount of cash Fabian happened to have on his person that night—are not of a quality or quantity that have obvious use to a gang or significant resale value. The evidence that Edwin was wearing Fabian's faux chain would naturally support a finding that the offense was for his personal gain, but it is not at all apparent how that evidence could lead one to reasonably conclude that the robbery conferred a financial benefit on ATM/ESF as a whole.

Deusenberry did not explain how the robbery benefited the gang, and the prosecutor did not clarify matters during closing arguments. On the topic of predicate offenses, the prosecutor argued:

> "You heard about a pattern of criminal gang activity. And when you look at the Code and you look at the instructions you will receive, and the judge will read, 'two or more prior qualifying offenses.' That is the legal definition of a gang.
>
> "Approximately an hour or so ago, I read to you and I described to you, two what we call 'predicate offenses.' That's two examples of prior convictions by Gang Member Jovan [M.], by ATM/ESF Gang Member Tajah [S.]. That is what a gang is. And we can also utilize our common sense. And when I say 'utilize our common sense,' obviously we're

21

> gonna let the law guide us and describe what that legal definition is."

Other than encouraging the jurors to use their common sense, the prosecutor did not offer them any theory on which they could find the robbery of Fabian actually benefited ATM/ESF in a more than reputational manner.

The Attorney General emphasizes the fact that multiple ATM/ESF members jointly perpetrated the attack on Fabian. Relying on *People v. Renteria* (2022) 13 Cal.5th 951, at pages 963 to 964 (*Renteria*), the Attorney General contends this evidence shows the robbery was committed to benefit ATM/ESF as a whole, as opposed to any member individually. In the wake of Assembly Bill 333, we find this argument uncompelling.

In the relevant portion of *Renteria*, the Supreme Court reviewed its earlier decision in *Albillar*, *supra*, 51 Cal.4th 47 and distilled its analysis as follows: "[I]n cases where multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime *often* provides sufficient evidence of association and benefit, as well as circumstantial evidence of an intent to promote the criminal activity of other gang members, in connection with the very same criminal offense." (*Renteria*, *supra*, 13 Cal.5th p. 963, italics added.) Critically, however, *Albillar* predated Assembly Bill 333 by over a decade, and *Renteria* explicitly declined to decide the effect of the new law and instead "focus[ed] on the law as it existed before the enactment of Assembly Bill 333." (*Renteria*, at p. 961 & fn. 6.)

Joint involvement in a crime may have provided sufficient evidence of benefit to the gang in many cases before Assembly Bill 333, when the benefit could be purely reputational. Indeed, in *Albillar* itself, three gang members committed sexual offenses in concert and the Supreme Court held there was

substantial evidence to show the offenses benefited the gang by *enhancing its reputation for viciousness*. (*Albillar*, *supra*, 51 Cal.4th at pp. 50, 63.)

But in this post-Assembly Bill 333 era, where the prosecution must now prove that predicate offenses provide a common benefit to the gang that is more than reputational (§ 186.22, subds. (e)(1), (g)), mere joint involvement in an offense carries less weight in establishing the requisite benefit. It certainly cannot be the case—as the Attorney General suggests—that any time two or more gang members collectively engage in some form of theft, there is *automatically* a common benefit to the gang based on financial gain, regardless of whether there is any evidence the gang actually benefited from the crime—financially or otherwise. "[S]uch an interpretation is inconsistent with the legislative history [of Assembly Bill 333] indicating the Legislature was concerned with 'lax' interpretations of the prior law that allowed for overly expansive application of gang enhancements and therefore sought to amend the law by 'making the standards for applying a gang enhancement more rigorous.' " (*Cooper*, 14 Cal.5th at pp. 744–745, citation omitted.)

In this case, at least, where the record is otherwise devoid of evidence showing the robbery conferred a financial (or other nonreputational) benefit to ATM/ESF as a whole, the mere fact that multiple members committed the offense together does not make the difference in demonstrating that benefit.

Finally, the Attorney General briefly mentions that the robbery of Fabian benefited ATM/ESF "by intimidating witnesses." But he does not offer any analysis to support this theory. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [points unsupported by legal argument with citation to authorities may be passed without consideration].) Based on our review of the record, there was no evidence that Fabian witnessed some other

ATM/ESF offense, nor was there evidence that anyone witnessed the attack on Fabian.

In short, not every crime committed by gang members results in a common benefit to the gang, much less one that is more than reputational. (See *Albillar, supra*, 51 Cal.4th at p. 60.) The evidence in this case was insufficient to prove the robbery of Fabian benefited ATM/ESF as a whole— as opposed to the attackers individually—in a more than reputational way.

Since the law requires two predicate offenses to prove "a pattern of criminal gang activity," which is in turn necessary to establish a "criminal street gang," and the robbery of Fabian does not qualify, the evidence does not support the jury's finding that ATM/ESF constitutes a "criminal street gang." (See *People v. Barnes* (2024) 107 Cal.App.5th 560, 591.) And because the gang special circumstance and alternate penalties all depend on proof of a "criminal street gang" (see §§ 186.22, subds. (b)(1), (5), (f), 190.2, subd. (a)(22)), we must reverse the true findings on all of the gang allegations.[7]

## B. *There is sufficient evidence of intent to kill to support the attempted murder convictions.*

Harper also contends insufficient evidence supports his attempted murder convictions because the prosecution failed to prove he intended to kill Omari M., DiMarques W., and Joseph M. Focusing on select aspects of Omari's testimony, Harper insists the only reasonable inference the jury could draw is that he was firing the gun at the ground, which belies an intent to kill. We disagree and affirm these convictions.

---

[7] Because we are reversing the true findings on the gang allegations on this ground, we need not decide whether Jovan M.'s conspiracy offense qualifies as a predicate, or the remainder of Harper's challenges to the sufficiency of the evidence underlying the gang allegations.

Attempted murder requires proof of intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 739–740 (*Smith*).) Since there is rarely direct evidence of a defendant's mental state, intent to kill is usually "inferred from the defendant's acts and the circumstances of the crime." (*Id*. at p. 741.)

Here, the jury could readily infer Harper intended to kill Omari, DiMarques, and Joseph based on the testimony and statements from these three young men. Omari saw the first shot clearly, saw Cullors fall to the ground, and then, as he turned to run, saw Harper shoot Cullors twice more in his peripheral vision. Omari testified that Harper "started to shoot towards us as we began to turn" and "run up through the McDonald's parking lot." He did not see Harper point the gun at him. But as he ran with DiMarques and Joseph, he heard three or four shots fired in their direction. He saw multiple sparks on the ground near his feet,[8] where bullets struck the pavement between him and DiMarques. Omari estimated they were 20 or 30 feet away from Harper when he saw the sparks.

DiMarques also saw Harper point the gun directly at Cullors's head and pull the trigger. Then, DiMarques "saw him turn the gun to us and start shooting." He recalled that Harper began shooting at them *before* they started running. He said Harper "emptied a clip," meaning he fired multiple shots at them. A bullet "almost hit" Omari. DiMarques believed that Harper was trying to kill them.

Joseph only gave a short statement to police. After he saw Harper shoot Cullors, he turned around, started running, and heard "shots coming at

---

[8]    Omari initially testified that the sparks were "a few feet" beside him. But on cross-examination, when his memory was refreshed with his statements to police just two days after the shooting, Omari said the sparks were "just inches away from" his legs.

25

us." His shoe fell off as he ran, but he kept going. He was not going to risk stopping and getting shot.

While the accounts of these young men varied in some respects, they all consistently stated that Harper fired multiple rounds *at* them as they ran for their lives. At least some of the rounds missed them by a matter of inches. This is sufficient to support a finding of intent to kill. (See *Smith*, *supra*, 37 Cal.4th at p. 742 ["the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"]; cf. *People v. Cardenas* (2020) 53 Cal.App.5th 102, 120 (*Cardenas*) ["Cardenas pointed a gun in Juan's direction and fired. The jury could reasonably infer from that evidence that Cardenas specifically intended to kill Juan."].)

Moreover, while evidence of motive is not required to establish intent to kill, it is often probative of that mental state. (*Smith*, *supra*, 37 Cal.4th p. 741.) As the Attorney General points out, the jury could have reasonably found that Harper had reason to "silence" Omari, DiMarques, and Joseph: they had just witnessed him kill their cousin and friend.

Harper seizes upon Omari's testimony that when the trio was about 20 or 30 feet away from Harper, he saw sparks on the ground near his feet where bullets struck the pavement between him and DiMarques. Harper asserts this testimony conclusively establishes that his gun was pointed at the ground, which belies an intent to kill. We reject this argument at its premise. Based on Omari's testimony about the sparks—in conjunction with evidence from all three young men that Harper fired multiple shots *at* them—the jury could have reasonably inferred that Harper was aiming to shoot them, but missed. The fact that the trio " ' "may have escaped death because of [Harper's] poor marksmanship" ' " does not prove a less culpable

26

state of mind. (*Smith*, *supra*, 37 Cal.4th at p. 741; cf. *Cardenas*, *supra*, 53 Cal.App.5th at p. 120 [it is reasonable to infer from evidence that "bullets struck Chris and Juan in their feet and ankles" that "Cardenas intended to shoot to kill both Chris and Juan but had poor aim"].)

Harper includes two trigonometric figures in his opening brief—drawing a line from where he assumes his shoulder would be based on his overall height to the ground, 20 feet away in one figure and 30 feet away in another—to argue that he must have been pointing the gun down toward the ground. But he fails to account for the fact that the trio was sprinting away in zigzagged paths. The defense presented no expert testimony establishing that it was mathematically impossible that Harper was pointing the gun *at* the young men.

In sum, the record includes ample evidence to support the jury's finding that Harper intended to kill Omari, DiMarques, and Joseph. We decline Harper's invitation to construe isolated bits of the record against the judgment. We therefore affirm his three attempted murder convictions.

## C. *The issue concerning the abstract of judgment is moot.*

Harper also seeks correction of the abstract of judgment. The jury found true that Harper personally discharged a firearm in the commission of each attempted murder count within the meaning of section 12022.53, subdivision (c). The trial court properly imposed a 20-year enhancement on each attempted murder count, but the minute order of sentencing and abstract of judgment erroneously identifies the punishment as 20 years *to life*.

Harper is correct that there is an error, but the issue has become moot. Since we are reversing the jury's true findings on all of the gang allegations, Harper will be entitled to full resentencing on remand, and a new minute

27

order of sentencing and abstract of judgment will thereafter issue.  He may alert the court to this mistake at his resentencing hearing, if he so chooses.

## DISPOSITION

The judgment is reversed, and the matter remanded to the trial court for further proceedings consistent with this opinion.  The prosecution may not retry Harper on any of the gang allegations.


DATO, Acting P. J.

WE CONCUR:


DO, J.


KELETY, J.

28